**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | |
|---|---|
| JIM SATCHER, INC., d/b/a JIM SATCHER MOTORS, | Case No. 8:15-cv-04756 |
| Plaintiff, | |
| v. | |
| SANTANDER CONSUMER USA INC., d/b/a CHRYSLER CAPITAL | |
| Defendant. | |

<u>**DEFENDANT SANTANDER CONSUMER USA INC. D/B/A CHRYSLER CAPITAL'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

     A.    Chrysler Capital and Satcher Enter into Automotive Financing
         Agreements ................................................................................. 2

     B.    Chrysler Capital Investigates Suspicious Activity Associated with
         Accounts Originated by Satcher .................................................. 3

     C.    Chrysler Capital Requests that Satcher Audit the Fifty-Five
         Suspicious Accounts ................................................................... 4

     D.    Satcher Fails to Cooperate .......................................................... 5

     E.    Satcher Does Not Provide Audit Results ..................................... 7

     F.    Chrysler Capital has suffered over $1 million in damages as a
         result of Satcher's conduct ......................................................... 8

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT .......................................................................................................... 9

     I.    Chrysler Capital is Entitled to Summary Judgment on Satcher's Breach of
        Contract Claim Because Chrysler Capital Did Not Breach the Applicable
        Agreements and Because Satcher Cannot Establish Damages ............................. 9

         A.    Satcher has failed to present evidence that Chrysler Capital
            breached the Agreements ........................................................ 10

         B.    Satcher has failed to present evidence that Chrysler Capital's
            conduct damaged Satcher ....................................................... 11

     II.   Chrysler Capital is Entitled to Summary Judgment on Its Breach of
        Contract Claim Because Chrysler Capital Breached the Contract By
        Submitting Applications Containing False Information and By Failing to
        Cooperate in Good Faith with the Audit ........................................................... 12

         A.    Satcher Breached Paragraph 9(a) of the Chrysler Capital
            Agreement and Paragraph 8(G) of the DFS Agreement by
            Submitting Applications Containing False Information ......................... 12

            i.    Satcher failed to take any steps to verify the information
                contained in the applications ..................................................... 13

            ii.   Mr. Wash's knowledge of the fraudulent credit applications
                is imputed to Satcher ................................................................. 13

# TABLE OF CONTENTS
### (continued)

**Page**

B.    Satcher Breached Paragraph 4(c) of the Chrysler Capital Agreement by Failing to Cooperate in Good Faith with Chrysler Capital's Request for an Audit and by Failing to Inform Chrysler Capital of the FBI's Investigation ............................................................ 18

       i.    Satcher breached paragraph 4(c) by failing to cooperate with Chrysler Capital's request for an audit ............................... 18

       ii.    Satcher breached paragraph 4(c) by failing to inform Chrysler Capital of the FBI's investigation ................................. 19

C.    Chrysler Capital was Damaged by Satcher's Breach .............................. 19

III.    Chrysler Capital is Entitled to Summary Judgment on Satcher's Declaratory Judgment Claim Because Satcher's Declaratory Judgment Claim is Procedurally Inappropriate and Because Satcher Breached the Agreements and Is Obligated to Repurchase the Accounts ................................. 20

A.    Satcher's Declaratory Judgment Claim is Procedurally Inappropriate Because Satcher Seeks to Adjudicate Its Past Conduct and Liability to Chrysler Capital ................................................ 20

B.    Satcher is Obligated to Repurchase the Identified Loans Because it Breached Material Obligations under the Agreements ........................... 21

C.    Satcher Admits that the Applicable Contract is the Chrysler Capital Agreement, not the Road Loans Agreement ............................................ 22

D.    Chrysler Capital Can Suspend Satcher from its Financing Program Without Notice Because It Identified a Pattern of Fraudulent or Suspicious Activity and Because Satcher Breached the Agreements ...... 23

E.    The DFS Agreement was Never Terminated ........................................... 23

CONCLUSION.................................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. G.J. Creel & Sons, Inc.*,
   320 S.C. 274 (1995) ........................................................................................................9

*Baker v. Denton*,
   37 F. Supp. 3d 794 (D.S.C. 2014) ................................................................................9

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976) ....................................................................................................13

*Brink's v. City of New York*,
   717 F.2d 700 (2d Cir. 1983) ........................................................................................14

*Buckle v. Boulware*,
   No. CV51502088TMCKDW, 2016 WL 4055679 (D.S.C. May 12, 2016) ..................13

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) ................................................9

*Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*,
   819 F.2d 1471 (8th Cir. 1987) ....................................................................................14

*Corliss v. O'Brien*,
   200 F. App'x 80 (3d Cir.2006) ....................................................................................21

*F.D.I.C. v. Fid. & Deposit Co. of Maryland*,
   45 F.3d 969 (5th Cir. 1995) ........................................................................................14

*Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC*,
   414 S.C. 635 (Ct. App. 2015) ......................................................................................9

*Koon v. McBee*,
   No. 2:14-CV-2663-RBH, 2015 WL 2105904 (D.S.C. May 6, 2015), *aff'd*, 613
   F. App'x 269 (4th Cir. 2015) ..................................................................................20, 21

*LiButti v. United States*,
   107 F.3d 110 (2d Cir. 1997) ........................................................................................14

*Maryland v. Universal Elections, Inc.*,
   862 F. Supp. 2d 457 (D. Md. 2012), *aff'd*, 729 F.3d 370 (4th Cir. 2013) ..................13

*Parks v. Lyons*,
   219 S.C. 40, 64 S.E.2d 123 (1951) ..............................................................................9

*RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*,
    808 F.2d 271 (3d Cir. 1986)...........................................................................14

*Richardson v. Cabarrus Cty. Bd. of Educ.*,
    151 F.3d 1030 (4th Cir. 1998) (unpublished table opinion) ...................................13

*Rowley v. City of North Myrtle Beach*,
    Nos. 4:06–1873–TLW–TER, 4:07–1636–TLW–TER, 2009 WL 750406
    (D.S.C. March 16, 2009)...........................................................................21

*S. Glass & Plastics Co. v. Kemper*,
    399 S.C. 483 (Ct. App.2012) ................................................................9, 11

*Swinton Creek Nursery v. Edisto Farm Credit, ACA*,
    334 S.C. 469 (1999) .................................................................................9

*Teamsters Joint Council No. 83 v. Centra, Inc.*,
    947 F.2d 115 (4th Cir. 1991) ......................................................................9

*Trevillyan v. APX Alarm Sec. Sys., Inc.*,
    No. CA 2:10-1387-MBS, 2011 WL 11611 (D.S.C. Jan. 3, 2011)...........................21

**Statutes**

28 U.S.C. § 2201(a) ......................................................................................20

**Other Authorities**

Fed. R. Civ. P. 30(b)(6)....................................................................................6

Fed. R. Civ. P. 56(a) .......................................................................................9

## INDEX OF EXHIBITS

| Exh. | Description |
|:---:|---|
| 1 | Chrysler Capital Declaration |
| 2 | May 17, 2004 Agreement ("DFS Agreement") |
| 3 | April 17, 2013 Agreement ("Chrysler Capital Agreement") |
| 4 | Excerpts of the Deposition of David Satcher on December 6, 2016 (Satcher 30(b)(6) witness) |
| 5 | Excerpts of the Deposition of Mark Kasak (Chrysler Capital Employee) |
| 6 | Excerpts of the Deposition of Michael Thigpen (Satcher 30(b)(6) witness relating to audit) |
| 7 | Chrysler Capital Investigation File |
| 8 | September 25, 2015 Call Recording |
| 9 | September 25, 2015 Call Transcript |
| 10 | Excerpts of the Deposition of David Satcher on September 21, 2016 (Satcher 30(b)(6) witness) |
| 11 | Satcher Audit Summary |
| 12 | Excerpts of the Deposition of Michelle Satcher (Satcher Employee) |
| 13 | Excerpts of the Deposition of Steven Prince (Satcher 30(b)(6) witness relating to verifying accuracy of loan applications) |
| 14 | Excerpts of the Deposition of Chase Nowlin (Chrysler Capital Employee) |
| 15 | Excerpts of Deposition of Matt Wash (Former Satcher Employee) |

## INTRODUCTION

This case involves fifty-five loans funded based on inaccurate loan applications submitted by Plaintiff Jim Satcher, Inc. d/b/a Jim Satcher Motors ("Satcher") to Defendant Santander Consumer USA, Inc. d/b/a Chrysler Capital ("Chrysler Capital").  After coordinating with law enforcement and performing an internal investigation, Chrysler Capital determined that the applications contained suspicious employment and income information, and every loan involved Satcher's sales associate Matt Wash and a member of the Irish Travelers group, a community of individuals living near Edgefield, South Carolina.  After determining Satcher's involvement in a potential fraud ring, Chrysler Capital promptly contacted Satcher and asked them to perform an investigation into the representations on fifty-five loan applications and the involvement of their employee Mr. Wash, who has invoked his Fifth Amendment rights throughout this litigation.

Satcher agreed to perform the requested audit, but ultimately did not do so—even when the FBI also contacted Satcher for information relating to the same fifty-five deals.  Instead, Satcher asked its warranty administrator to check the fifty-five deal jackets for whether the files contained stipulated documents.  The auditor reported back that, even under this basic "checklist" review, Satcher had not obtained requisite documentation for twenty-four loans.  Rather than provide its audit results to Chrysler Capital, Satcher obtained legal counsel, ambushed Chrysler Capital with Satcher's legal counsel on a teleconference set up to discuss the audit results, and then promptly filed this lawsuit.

Unsurprisingly, during the Irish Travelers fraud in 2014 and 2015, Satcher experienced record sales.  Now that Satcher's sales have returned to 2013 levels, Satcher claims that its inability to obtain funding from Chrysler Capital has caused it harm (despite Chrysler Capital having no obligation to fund Satcher's loans and despite Satcher's relationships with twenty other lenders).  Despite extensive discovery, Satcher has failed to produce any evidence in support of its breach of

contract and declaratory judgment claims. To the contrary, the undisputed evidence demonstrates that Satcher breached its obligations under the financing agreements by submitting applications containing false information and by failing to cooperate with Chrysler Capital's investigation efforts. As a result, Chrysler Capital is entitled to summary judgment on Satcher's breach of contract and declaratory judgment claims as well as summary judgment on Chrysler Capital's breach of contract claim against Satcher.

## STATEMENT OF FACTS

### A.     Chrysler Capital and Satcher Enter into Automotive Financing Agreements.

Chrysler Capital provides financing for the purchase and lease of vehicles, including, in relevant part, to Satcher. [Exh. 1 (Kasak Decl.) ¶ 7]. Two agreements govern the parties' relationship relating to the loans at issue in this case: a May 17, 2004 agreement with Chrysler Capital doing business as Drive Financial Services, LP ("DFS Agreement")[1] and an April 17, 2013 agreement ("Chrysler Capital Agreement," collectively with the DFS Agreement, the "Agreements"). [Exh. 1 (Kasak Decl.) ¶¶ 8–9; Exh. 2 (DFS Agreement); Exh. 3 (Chrysler Capital Agreement).][2] Pursuant to the Agreements, Satcher is obligated to verify the accuracy of consumer information, cooperate with Chrysler Capital's efforts to resolve disputes, and repurchase customer contracts upon a breach of the respective Agreements. [Exh. 3 (Chrysler Capital Agreement) ¶¶ 4(c), 7(a), 9(a), 9(j); Exh. 2 (DFS Agreement) ¶¶ 8(G), 9(A).] In particular, Satcher agreed:

---

[1] Chrysler Capital is the successor by merger to Drive Financial Services, LP and all of the assets and liabilities of Drive Financials, LP. [Exh. 1 (Kasak Decl.) ¶ 8.]

[2] The 4 accounts listed in paragraph 14 of Satcher's Amended Complaint and in paragraphs 13 through 39 of Chrysler Capital's Amended Counterclaims are governed by the DFS Agreement. The remaining 51 accounts at issue, which are listed in Exhibit 3 to Satcher's Complaint, are governed by the Chrysler Capital Agreement. [Exh. 1 (Kasak Decl.) ¶10.] Satcher's corporate representative now admits that the "Amended Non-Recourse Master Dealer Agreement", attached to the Amended Complaint as Exhibit 2 and included as ECF No. 27-2, is not applicable to this matter. [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 5:20-7:18.]

> [Satcher] shall cooperate with [Chrysler Capital] to resolve any disputes in connection with a Contract and/or Automobile. [Satcher] shall report to [Chrysler Capital] if it knows or has reason to know of, with respect to any Application or Contract: (i) any actual, suspected or attempted material violation of the law . . . or (ii) suspicious activity related to actual, suspected or attempted money laundering activity or any type of fraud.

[Exh. 3 (Chrysler Capital Agreement) ¶ 4(c).]

Furthermore, the parties agreed that in the event that Chrysler Capital "determines that there has been a pattern of fraudulent or suspicious activity by" Satcher, Chrysler Capital may "immediately suspend the [financing program] without notice." [Exh. 3 (Chrysler Capital Agreement) ¶ 15(d).] And Chrysler Capital may demand that Satcher repurchase certain contracts where, in relevant part, Satcher fails to comply with a term or condition of the Agreements. [Exh. 3 (Chrysler Capital Agreement) ¶ 7(a); Exh. 2 (DFS Agreement) ¶ 9(A).]

### B.    Chrysler Capital Investigates Suspicious Activity Associated with Accounts Originated by Satcher.

In August and September 2015, Chrysler Capital began investigating finance accounts originated by dealerships in Satcher's geographic area for the Irish Travelers community after one loan application at another dealership hit on a name included on Chrysler Capital's fraud interdiction list and Chrysler Capital received a tip from another dealership regarding a portion of the Irish Travelers community who were trying to obtain automobile financing through the use of potentially fraudulent credit applications. [Exh. 5 (Kasak Tr.) at 18:10-19:6, 25:12-19.] In the course of that investigation, Chrysler Capital identified fifty-five accounts originated by Satcher that appeared to contain fraudulent employment and income information. [Exh. 1 (Kasak Decl.) ¶¶ 14, 15, 25.] For example, a series of applications from Satcher's customers listed employers that Chrysler Capital could not locate in a public records search and could not contact through the phone numbers provided on the applications. [Exh. 5 (Kasak Tr.) at 21:9-22:14, 29:5-31:14, 32:8-33:7, 74:22-76:22, 88:8-91:11; Exh. 1 (Kasak Decl.) ¶ 14; Exh. 7 (Investigation File).]    Other

applications from Satcher's customers listed income that appeared to be inflated or relied on pay stubs that appeared to be falsified.  [Exh. 5 (Kasak Tr.) at 22:13-14, 29:5-31:14, 34:9-23, 79:1-82:2, 85:17-86:16; Exh. 1 (Kasak Decl.) ¶ 14; Exh. 7 (Investigation File).]  Satcher's salesman, Matt Wash, was involved with all fifty-five suspicious applications.  [Exh. 4 (D. Satcher 12/6/16 Tr.) at 49:13-17.]

After coordinating with law enforcement and concluding its initial investigation, Chrysler Capital reasonably believed that applications containing falsified income and employment information had been submitted by Satcher to Chrysler Capital.  [Exh. 1 (Kasak Decl.) ¶ 16.] Chrysler Capital therefore suspended Satcher from the financing program and coordinated with Satcher to schedule a call to discuss the suspicious loan applications.  [Exh. 1 (Kasak Decl.) ¶¶ 17, 20.]

### C.    Chrysler Capital Requests that Satcher Audit the Fifty-Five Suspicious Accounts.

During a September 25, 2015 call between the parties, Chrysler Capital informed Satcher that it had identified fifty-five accounts originated between 2013 and 2015 to members of the Irish Travelers that appeared to contain false employment and income information.  [Exh. 1 (Kasak Decl.) ¶ 18; Exh. 8 (9/25/2015 Call Recording) at 2:27-4:07, 6:00-6:35, 10:38-11:04; Exh. 9 (9/25/2015 Call Tr.) at 2-10.][3]  Chrysler Capital also informed Satcher that Matt Wash was

---

[3] Satcher recorded this call and produced it in discovery in this litigation.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 11:19-24; Exh. 12 (M. Satcher Tr.) at 21:20-25:18.]  Using Satcher's recording, counsel for Chrysler Capital prepared a transcript of that call, which was reviewed by Ms. Michelle Satcher during her deposition.  [Exh. 12 (M. Satcher Tr.) at 21:20-25:18.]  Exhibit 12 is a rough copy of Ms. Satcher's deposition transcript, and Chrysler Capital will provide the final copy with its reply briefing.

Additionally, members of the Irish Traveler community have been federally indicted for the alleged fraudulent scheme to submit false application information to automotive financers.  [Exh. 10 (D. Satcher 9/21/2016 Tr.) at 19:19-20:2, 64:12-65:5.]

involved with every suspicious account.  [Exh. 8 (9/25/2015 Call Recording) at 2:27-4:07; Exh. 9 (9/25/2015 Call Tr.) at 3.

During the call, Chrysler Capital requested that Satcher audit the accounts to investigate the representations on the applications and the nature of Mr. Wash's involvement with the accounts.  [Exh. 8 (9/25/2015 Call Recording) at 7:00-8:47, 14:30-15:06; Exh. 9 (9/25/2015 Call Tr.) at 3, 5, 8-10; Exh. 10 (D. Satcher 9/21/2016 Tr.) at 40:14-25.]   Chrysler Capital provided detailed information relating to the suspected fraud and made clear that it wanted to work with Satcher to investigate in order to continue the parties' working partnership.  [Exh. 9 (9/25/2015 Call Tr.) at 14.]  For example, Chrysler Capital informed Satcher that applicants were listing fake employers, submitting false pay stubs, and providing phone numbers that linked to other residences, people, and places of employment.  [*Id.* at 2, 4.]  Satcher agreed to perform the requested audit.  [Exh. 10 (D. Satcher 9/21/2016 Tr.) at 43:22-24.]

    **D.      Satcher Fails to Cooperate.**

Satcher's corporate representative does not dispute that Chrysler Capital was "very clear of [its] concerns about fraud relating to these loans" in the September call.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 14:9-14]  Satcher understood that its audit, if conducted as Chrysler Capital instructed, should involve a detailed review of the fifty-five accounts to determine if the loan applications contained fraudulent employment and income information.  [*Id.* at 15:13-15, 20:2-7.] However, Satcher did not ask its selected auditor, Michael Thigpen, to verify the accuracy of any information contained in the identified applications.[4]  In fact, Satcher admits that it did not provide

---

[4] Mr. Thigpen is a warranty administrator for car dealerships, not a professional auditor, and made clear to Satcher that the only audit he would be able to perform was a review of the deal jackets to determine what paperwork was contained in those jackets.  [Exh. 6 (Thigpen Tr.) at 9:7-25, 38:1-15.]

Mr. Thigpen with any instructions regarding how to perform the audit.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 23:20-24:9; Exh. 6 (Thigpen Tr.) at 48:10-18, 48:24-49:9.]

Satcher admits that Mr. Thigpen asked it "many times" to provide more information regarding the purpose of the audit.[5]  [Exh. 6 (Thigpen Tr.) at 70:18-71:8.]  Rather than provide Mr. Thigpen with a copy of the September 25, 2015 call recording, Satcher informed Mr. Thigpen that it did not know why the audit was being conducted and did not know what Chrysler Capital wanted from the audit.   [*Id*. at 9:7-25, 42:6-43:7, 53:6-20.]  As a result, Mr. Thigpen's review consisted solely of making "a checklist sheet" of items contained in the fifty-five deal jackets. [*Id*. at 42:6-43:7, 9:17-10:9, 51:10-52:15.]  He *did not* verify the accuracy of the information contained in the applications.  [*Id.* at 51:10-52:15; Exh. 11 (Audit Summary).]  Even performing this basic review of the deal jackets, Mr. Thigpen identified twenty-four loans that were not in compliance with document requirements.  [Exh. 11 (Audit Summary); Exh. 6 (Thigpen Tr.) at 104:8-107:16; Exh. 12 (M. Satcher Tr.) at 38:4-22.]

During the audit, neither Mr. Thigpen nor anyone at Satcher made any attempts to interview Mr. Wash concerning his involvement with these accounts.  [Exh. 6 (Thigpen Tr.) at 57:17-58:2; Exh. 4 (D. Satcher 12/6/2016 Tr.) at 23:10-19.]  Satcher did not revoke Mr. Wash's ability to submit deals directly to lenders through the RouteOne software system, even though Mr. Wash was the only sales associate with such direct access to lenders.  [Exh. 12 (M. Satcher Tr.) at 18:25-19:6.]  Satcher did not terminate Mr. Wash for his involvement in the scheme; rather, Mr. Wash quit in April 2016 but then Satcher asked him to return during the summer of 2016 to sell

---

[5] Mr. Thigpen was designated as Satcher's corporate representative for information related to the audit and Satcher is thus bound by his testimony.  [Exh. 6 (Thigpen Tr.)  at 13:23-14:16.]; *see also* Fed. R. Civ. P. 30(b)(6) (allowing corporation to "designate other persons who consent to testify on its behalf" as its corporate representative).

cars. [*Id.* at 48:4-25.]  To date, Satcher has not investigated Mr. Wash's involvement with the fraudulent applications, and Chrysler Capital's ability to do so was limited by Mr. Wash's invocation of his Fifth Amendment rights to every question asked at his deposition. [*See generally* Exh. 15 (Wash Tr.).]

        **E.**       **Satcher Does Not Provide Audit Results.**

        Chrysler Capital representatives contacted Satcher on multiple occasions in October and November of 2015 while attempting to schedule a call to discuss Satcher's audit results.  [Exh. 1 (Kasak Decl.) ¶ 24.]  On November 5, 2015, Satcher received grand jury subpoena and the FBI entered the dealership and demanded that Satcher provide documentation relating to the fifty-five loan applications.  [Exh. 12 (M. Satcher Tr.) at 39:17-40:1; Exh. 4 (D. Satcher 12/6/16 Tr.) at 8:14-18, 9:4-10:18.]  Satcher retained counsel to assist them with the FBI's investigation.  [Exh. 12 (M. Satcher Tr.) at 39:17-40:1.]  However, Satcher never informed Chrysler Capital that the FBI had collected information relating to the very loans it had asked Chrysler Capital to audit.  [Exh. 4 (D. Satcher 12/6/16 Tr.) at 10:19-21.]

        On November 9, 2015, representatives of both parties took part in a scheduled telephone conference to discuss the results of the audit.  [Exh.10 (D. Satcher 9/21/2016 Tr.) at 80:2-7.]  Unbeknownst to Chrysler Capital, Satcher asked its newly retained legal counsel to join the call. [Exh. 12 (M. Satcher Tr.) at 39:17-41:18.]  Before the audit results could be discussed, Chrysler Capital learned that Satcher had legal counsel on the call; and given the presence of counsel, Chrysler Capital's representatives felt uncomfortable continuing the call without Chrysler Capital's own legal team involved, so Chrysler Capital terminated the call.  [Exh. 5 (Kasak Tr.) at 35:12-36:6.]

        Shortly after the call, on November 25, 2015, Satcher sued Chrysler Capital in the instant litigation.  Chrysler Capital did not receive the results of the audit—in particular the auditor's one-

page audit summary—until after Satcher sued Chrysler Capital and the documents were produced in litigation discovery. [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 29:20-22; Exh. 1 (Kasak Decl.) ¶ 24.]

**F.    Chrysler Capital has Suffered Over $1 Million in Damages as a Result of Satcher's Conduct.**

As a result of Satcher's conduct, Chrysler Capital has incurred approximately $1.1 million in damages, in part due to Satcher's refusal to repurchase the accounts requested.  [Exh. 1 (Kasak Decl.) ¶¶ 25-26.]

Satcher, on the other hand, has provided no evidence of damages in this litigation. Satcher's corporate representative merely contended that "common sense" shows that Satcher was damaged by Chrysler Capital's refusal to fund additional loans.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 47:1-11, 48:4-8.]    However, Satcher could not identify any specific damage caused by Chrysler Capital, and Satcher has admitted that it has nearly twenty lender options, up from 10-12 options in 2013.  [*See generally id.* at 47:1-48:8; Exh. 12 (M. Satcher Tr.) at 57:4-10.]  In fact, Satcher has admitted that its 2016 sales numbers are on par with its 2013 sales numbers prior to the fraudulent loans at issue in this litigation.[6]  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 42:3-18, 43:24-45:10.]   Indeed, Satcher has relationships with sixteen to twenty lenders, and continues to do business at a rate commensurate with the 2013 pre-fraud time period, despite implementing a company policy whereby Satcher refuses to sell cars to any members of the Irish Traveler

---

[6] Unsurprisingly, Satcher's sales increased during 2014 and 2015, when it was submitting the fraudulent applications.  [*See* Exh. 4 (D. Satcher 12/6/2016) at 45:11-46:12.]  Furthermore, sales are "up and down" and that "there is no . . . steady average number [of sales] . . . from month to month[.]"  [Exh. 13 (Prince Tr.) at 57:5-24.]  Satcher could "do 35 [sales] one month," "50 [sales] the next month, and then . . . back down to 35 or 40 [sales] the next month."  [*Id.* at 57:25-58:57, 7:13-9:1; Exh. 4 (D. Satcher 12/6/2016 Tr.) at 42:22-43:2.]   For Satcher, selling thirty to thirty-five vehicles per month would be a "pretty good" month.  [Exh. 13 (Prince Tr.) at 56:17-57:4.] Finally, election years, such as 2016, are typically slow years.  [*Id.* at 58:17-59:1; Exh. 4 (D. Satcher 12/6/2016 Tr.) at 43:21-23, 44:7-12 (agreeing with Prince).]

community.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 42:3-18, 43:24-45:10; Exh. 12 (M. Satcher Tr.) at 49:3-52:4, 57:4-10.]

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir. 1991).  Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis."  *Baker v. Denton*, 37 F. Supp. 3d 794, 797 (D.S.C. 2014) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986)).

## ARGUMENT

I.    **Chrysler Capital is Entitled to Summary Judgment on Satcher's Breach of Contract Claim Because Chrysler Capital Did Not Breach the Applicable Agreements and Because Satcher Cannot Establish Damages.**

"The elements for a breach of contract are the existence of a contract, its breach, and damages caused by such breach." *S. Glass & Plastics Co. v. Kemper*, 399 S.C. 483, 491–92 (S.C. Ct. App. 2012).  A party that seeks to recover damages for breach of a contract must demonstrate that it has performed its part of the contract, "or at least that [it] was, at the appropriate time, able, ready, and willing to perform it." *Swinton Creek Nursery v. Edisto Farm Credit, ACA*, 334 S.C. 469, 487 (1999) (quoting *Parks v. Lyons*, 219 S.C. 40, 48 (1951)).  Furthermore, "there is no breach of an implied covenant of good faith where a party to a contract has done what provisions of the contract expressly gave him the right to do." *Hotel & Motel Holdings, LLC v. BJC Enterprises, LLC*, 414 S.C. 635, 653 (S.C. Ct. App. 2015) (quoting *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277 (1995)).

In its Amended Complaint, Satcher claims that Chrysler Capital breached the Agreements and their implied covenants of good faith by suspending Satcher from Chrysler Capital's financing program and by failing to provide advance notice of the suspension or the factual basis for that suspension. [Am. Compl. ¶¶ 29-32.] Satcher's breach of contract claim must be dismissed because there is no dispute that Chrysler Capital could suspend Satcher from its financing programs. Furthermore, Satcher has failed to identify any damages that were caused by Chrysler Capital's alleged breach.

**A.    Satcher Has Failed to Present Evidence that Chrysler Capital Breached the Agreements.**

The Agreements simply do not require Chrysler Capital to fund any of Satcher's loan applications (and do not require Satcher to submit loan applications to Chrysler Capital). [Exh. 2 (DFS Agreement) ¶ 2; Exh. 3 (Chrysler Capital Agreement) ¶ 3.] Furthermore, Satcher has agreed that it would be prudent for Chrysler Capital to suspend financing in order to take time to determine why fraudulent credit applications were being submitted. [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 24:22-25:10.] For these reasons alone, Satcher's breach of contract claim fails.

The Agreements also specifically allow for suspension or termination of the financing relationship entirely where Chrysler Capital identifies patterns of suspicious activity. Indeed, Chrysler Capital "may immediately suspend the Program without notice if it determines that there has been a pattern of fraudulent or suspicious activity by" Satcher. [Exh. 3 (Chrysler Capital Agreement) ¶ 15(d) (emphasis added); *see also* [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 5:20-6:7, 7:13-18 (agreeing that the Chrysler Capital Agreement, which is also attached to the Amended Complaint as Exhibit 1, is the applicable contract).] Chrysler Capital may also terminate Satcher from its financing program where, like here, Satcher breaches its obligations, representations, or

warranties under the Agreement.  [Exh. 2 (DFS Agreement) ¶ 9(D); Exh. 3 (Chrysler Capital Agreement) ¶ 15(c).]

Here, Chrysler Capital did not terminate the Agreements but merely suspended Satcher from further financing until Satcher completed an agreed upon investigation into the inaccurate employment and income information found on fifty-five of Satcher's applications.  Satcher has admitted that Chrysler Capital was "very clear of [its] concerns about fraud relating to these loans" and that this was a prudent decision for Chrysler Capital to take time to investigate the activity. [Exh 4 (D. Satcher 12/6/2016 Tr.) at 14:9-14, 24:20-25:11.]  Yet, Satcher chose not to complete the audit as requested nor share the results of the audit that it did perform; instead, Satcher chose to sue Chrysler Capital in this litigation.

**B.      Satcher Has Failed to Present Evidence that Chrysler Capital's Conduct Damaged Satcher.**

Even if Satcher could establish that Chrysler Capital's suspension of Satcher breached the Agreements – which it cannot – Satcher's claim additionally fails because Satcher cannot establish that Chrysler's Capital's breach caused it any harm.  "The general rule is that for a breach of contract the [breaching party] is liable for whatever damages follow as a natural consequence and a proximate result of such breach." *S. Glass & Plastics Co.*, 399 S.C. at 492.

In his deposition, Satcher's corporate representative contended only that "common sense" shows that Satcher was damaged by Chrysler Capital's refusal to fund additional loans and decreased sales.  [Exh. 4 (D. Satcher Tr.) at 47:1-14, 48:4-8.]  Satcher, however, has been unable to identify any specific damage caused by Chrysler Capital.  [*See generally id.* at 47:1-48:8.] Again, Chrysler Capital has no obligation to fund loans for Satcher, and Satcher is not required to seek funding from Chrysler Capital.  Indeed, Satcher has relationships with sixteen to twenty lenders, and continues to do business at a rate commensurate with the 2013 pre-fraud time period,

despite implementing a company policy whereby Satcher refuses to sell cars to any members of the Irish Traveler community.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 42:3-18, 43:24-45:10; Exh. 12 (M. Satcher Tr.) at 49:3-52:4, 57:4-10.]  Furthermore, Satcher's own corporate representative on this point admitted that Satcher's sales numbers fluctuate regularly but were "pretty good" compared to historical numbers, particularly for an election year, which are traditionally slow. [*See* Exh. 13 (Prince Tr.) at 56:17-57:4; Exh. 4 (D. Satcher 12/6/16 Tr.) at 42:3-18, 43:24-45:10 (agreeing with Prince).]

Satcher has not demonstrated that there was a decrease in sales following its suspension from the financing program, let alone that any such decrease was caused by the suspension as opposed to the general fluctuations in vehicle sales.  Therefore, Satcher's breach of contract claim fails.

**II.    Chrysler Capital is Entitled to Summary Judgment on Its Breach of Contract Claim Because Chrysler Capital Breached the Contract By Submitting Applications Containing False Information and By Failing to Cooperate in Good Faith with the Audit.**

**A.    Satcher Breached Paragraph 9(a) and 9(j) of the Chrysler Capital Agreement and Paragraph 8(G) of the DFS Agreement by Submitting Applications Containing False Information.**

Under paragraph 9(a) of the Chrysler Capital Agreement, Satcher represents and warrants that "[t]o the best of [Satcher's] knowledge . . . to the extent necessary and as required by Applicable Law, [Satcher] has verified the information provided by the Customer in the Application and Contract."  Satcher further warranted in paragraph 9(j) that "[a]ny credit information supplied by Dealer about Customer is true, complete and accurate to the best of Dealer's knowledge."  Similarly, under paragraph 8(G) of the DFS Agreement, Satcher represents and warrants that "[a]ny credit information supplied by [Satcher] as to the Buyer is true, complete and accurate to the best of [Satcher's] knowledge."  Here, Satcher violated this provision by failing

to take any steps to verify the accuracy of the information submitted by customers and by submitting applications containing false information.

### i. *Satcher failed to take any steps to verify the information contained in the applications.*

Satcher was obligated to verify the information contained in the credit applications to the extent necessary and as required by law. [Exh. 3 (Chrysler Capital Agreement) ¶ 9(a).] However, Satcher failed to take any affirmative steps to do so before submitting applications to the lenders. For example, Satcher made clear that it did nothing to verify income unless the lender made a specific request for verification. [Exh. 13 (Prince Tr.) at 86:15-87:6.] Rather, as long as the applicant signed the application, Satcher saw no reason to verify the information. [*Id.* at 50:9-17.][7] Satcher's failure to verify any of the information contained in the applications violates the Agreements, and therefore Chrysler Capital is entitled to summary judgment on this claim.

### ii. *Mr. Wash's knowledge of the fraudulent credit applications is imputed to Satcher.*

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" *Richardson v. Cabarrus Cty. Bd. of Educ.*, 151 F.3d 1030 (4th Cir. 1998) (unpublished table opinion) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Adverse inferences are appropriate at the summary judgment stage. *See, e.g.*, *Buckle v. Boulware*, No. CV51502088TMCKDW, 2016 WL 4055679, at *5 (D.S.C. May 12, 2016) (awarding negative inference on summary judgment); *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 464 (D. Md. 2012), *aff'd*, 729 F.3d 370 (4th Cir. 2013) (applying adverse inference at summary judgment phase based on defendants' invocation of a Fifth Amendment privilege against self-incrimination).

---

[7] Mr. Prince was designated as Satcher's corporate representative to discuss Satcher's procedures and policies for verifying customer's information. [Exh. 13 (Prince Tr.) at 7:13-9:1.]

An employee's invocation of his Fifth Amendment rights can result in an adverse inference against his employer.  For example, in *Brink's v. City of New York*, 717 F.2d 700 (2d Cir. 1983), the Second Circuit affirmed the district court's decision to allow the jury to consider a former employee's refusal to testify and held the refusal akin to a vicarious admission by the employee's employer.  *See also RAD Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271 (3d Cir. 1986) (holding that assertion of Fifth Amendment by employees of a corporation could be imputed to the corporation, despite the fact that employees were nonparties to the civil lawsuit); *see also LiButti v. United States*, 107 F.3d 110 (2d Cir. 1997) (drawing adverse inference against party by reason of party's father's invocation of his privilege against self-incrimination, even though the father was a non-party); *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.*, 819 F.2d 1471 (8th Cir. 1987) (determining that controlling member of charitable organization's invocation of right to remain silent was admissible against the charity, noting that member stood "in a position similar to the non-party ex-employees" in *Brink's* and *RAD*); *F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 45 F.3d 969 (5th Cir. 1995) (permitting adverse inference against bank surety when nonparty witness who received certain fraudulent bank loans refused to testify on Fifth Amendment grounds).

The Second Circuit in *LiButti* identified a four-factor test for imputing a non-party's invocation of the Fifth Amendment privilege and resulting adverse inference against a party: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and the non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation.  *LiButti*, 107 F.3d at 123-24.  Here, each *LiButti* factor supports awarding an adverse inference that Satcher had knowledge that it was submitting fraudulent loan applications to Chrysler Capital.

14

First, there is a close relationship between Mr. Wash and Satcher. Mr. Wash is a former Satcher sales associate, a very close personal friend of the Satchers, and he originated every account at issue in this litigation. [Exh. 4 (D. Satcher Tr.) at 49:13-17; Exh. 9 (9/25/2015 Call Tr.) at 3.] Second, Satcher vested extensive authority in Mr. Wash over the submission of credit applications to lenders. Mr. Wash would either have the customer fill out a credit application or would fill out the credit application himself. [Exh. 13 (Prince Tr.) at 56:7-10.] Satcher was so enamored with Mr. Wash's sales numbers that it gave Mr. Wash the authority to submit his credit applications to lenders directly, rather than having a member of Satcher's finance and insurance department review the credit applications and submit the information to the finance company. [*Id.* at 70:4-13.] Mr. Wash was the only sales associate authorized at Satcher to directly submit deals to lenders without review. [*Id.* at 70:4-71:1, 71:15-72:17; Exh. 12 (M. Satcher Tr.) at 14:3-16:17]

Third, Mr. Wash's assertion of his Fifth Amendment privilege assists both himself and Satcher. In particular, Mr. Wash asserted his Fifth Amendment privilege when asked questions related to the heart of this dispute—namely, whether anyone at Satcher was aware that the credit applications at issue in this case contained false information at the time those applications were submitted. *See generally* [Exh. 15 (Wash Tr.).]**.** In particular, Mr. Wash invoked his Fifth Amendment privilege when asked the following questions:

- "While you were at Satcher Motors as a salesperson were you aware of any members of the Irish Travelers community submitting false income, employment or home ownership information on a credit application that was going to be submitted to Santander?"

  "On advice of Counsel, I assert my Fifth Amendment right and therefore refuse to answer that question on that basis." [*Id.* at 10:1-12.]

- "Were there occasions where you made the Satchers or Steve Prince aware that you believed that members of the Irish Travelers community were submitting questionable or false information on credit applications?"

"On advice of Counsel, I assert my Fifth Amendment right and therefore refuse to answer the question on that basis." [*Id.* at 10:13-23.]

- "Between 2013 and 2016, when you left Satcher Motors, did you submit any credit applications that you knew to contain false information, with respect to employment or income information related to Irish Travelers, to Santander?"

  "On advice of Counsel I assert my Fifth Amendment right and therefore refuse to answer the question on that basis." [*Id.* at 11:14-25.]

- "To your knowledge, was David Satcher or Michelle Satcher or Steve Prince aware that you were submitting applications to Santander that contained false employment or income information as it related to the Irish Traveler customers?"

  "On advice of Counsel, I assert my Fifth Amendment right and therefore refuse to answer the question on that basis." [*Id.* at 12:9-19.]

- "Did you ever feel like you were threatened or pressured by the Satchers to keep the information that you knew about falsified credit applications quiet, in order for the Satchers to avoid people learning that this had gone on in their dealership?"

  "Under advice of Counsel, I assert my Fifth Amendment right and therefore refuse to answer the question on that basis." [*Id.* at 16:6-16.]

- "Were there occasions where you knew or had reason to know that suspicious activity related to actual suspected or attempted fraudulent activity was being conducted at Satcher Motors with respect to credit applications being submitted by customers and, in particular, members of the Irish Travelers community?"

  "Under advice of Counsel, I assert my Fifth Amendment [r]ight and therefore refuse to . . . answer the question on that basis." [*Id.* at 20:19-21:6.]

- "Were there occasions where . . . either the Satchers or Steve Prince knew or had reason to know of suspicious activity related to actual suspected or attempted activity involving fraud with respect to credit applications being submitted by customers, particularly those that were members of the Irish Travelers community?"

  "Under advice of Counsel, I assert my Fifth Amendment right and therefore refuse to answer the question on that basis." [*Id.* at 22:9-23.]

If Mr. Wash believed that the information contained in the loan applications was correct or that Satcher did not know the information was incorrect, he could have simply answered those questions in the negative. Instead, Mr. Wash chose to assert his Fifth Amendment protections,

16

suggesting that Mr. Wash knew the information contained in the loan applications was incorrect or that Satcher knew the information was incorrect. Further, Mr. Wash's assertion of this protection assists both Mr. Wash's personal interests and Satcher's interests in this litigation, given that both could be subject to liability for submitting applications containing fraudulent information either with law enforcement agencies or under the Agreements at issue in this case. Further, Satcher has prevented Chrysler Capital from obtaining this information through any other means, as Satcher failed to audit its accounts as requested by Chrysler Capital or interview Mr. Wash as part of any investigation.

Fourth, as evidenced by his involvement with the accounts at issue, Mr. Wash played a central role with respect to the underlying facts of this litigation.

In addition, Santander's own detailed investigation corroborates this inference. As described in more detail above, Chrysler Capital conducted a detailed investigation and ultimately determined that there had been a pattern of fraudulent or suspicious activity at Satcher's dealership. This included a series of applications that listed employers that could not be found in a public records search and could not be contacted through the phone numbers provided on the applications. [Exh. 5 (Kasak Tr.) at 21:9-22:14, 29:5-31:14; Exh. 1 (Kasak Decl.) ¶ 14; Exh. 14 (Nowlin Tr.) at 17:22-18:8, 19:21-21:7, 22:9-24:24.] Chrysler Capital also found that the applications contained income information that could not be substantiated and proof of income documentation that appeared falsified. [Exh. 5 (Kasak Tr.) at 22:13-14, 29:5-31:14, 34:9-23; Exh. 1 (Kasak Decl.) ¶ 14; Exh. 14 (Nowlin Tr.) at 38:2-8, 63:11-23, 78:11-80:16.]

Thus, Satcher should be considered aware of the false information contained in the applications that were submitted, which constitutes a breach of its Agreements with Chrysler Capital. Chrysler Capital should therefore be awarded summary judgment on its claim.

**B.    Satcher Breached Paragraph 4(c) of the Chrysler Capital Agreement by Failing to Cooperate in Good Faith with Chrysler Capital's Request for an Audit and by Failing to Inform Chrysler Capital of the FBI's Investigation.**

In the Chrysler Capital Agreement, Satcher agreed:

[Satcher] shall cooperate with Chrysler Capital to resolve any disputes in connection with a Contract and/or Automobile. [Satcher] shall report to Chrysler Capital if it knows or has reason to know of, with respect to any Application or Contract: (i) any actual, suspected or attempted material violation of the law . . . or (ii) suspicious activity related to actual, suspected or attempted money laundering activity or any type of fraud.

[Exh. 3(Chrysler Capital Agreement) ¶ 4(c).]  Here, Satcher breached this provision by failing to cooperate with Chrysler Capital's request for an audit and by failing to inform Chrysler Capital of the FBI's investigation.

> **i.    Satcher breached paragraph 4(c) by failing to cooperate with Chrysler Capital's request for an audit.**

Chrysler Capital reached out to Satcher after Chrysler Capital identified a series of account applications containing fraudulent information and requested that Satcher audit those accounts to determine why and how those fraudulent applications were being submitted by Satcher.  *See* [Exh. 8 (9/25/2015 Call Recording) at 2:27-4:07, 6:00-6:35, 7:00-8:47, 10:38-11:04 14:30-15:06; Exh 9 (9/25/2015 Call Tr.) at 2-10; Exh. 4 (D. Satcher 12/6/2016 Tr.) at 14:9-14, 15:13-15, 20:2-7.]

Satcher admits that it made no attempt to comply with Chrysler Capital's request for an audit.  Rather, Satcher selected an auditor who specifically informed Satcher that he could not perform the type of audit requested by Chrysler Capital; failed to provide the auditor with any background information about the audit; and failed to provide the auditor with any instructions about performing the audit. [Exh. 6 (Thigpen Tr.) at 9:7-25, 42:6-43:7, 48:10-18, 48:24-49:9, 53:6-20; Exh. 4 (D. Satcher 12/6/2016 Tr.) at 20:22-24, 21:15-23:9.]  As a result, instead of verifying the accuracy of the information contained in the applications, the auditor simply made a checklist sheet of documents contained in the deal jacket.   [Exh. 6 (Thigpen Tr.) at 51:10-52:2.]  Despite

this, Satcher still failed the audit, as numerous accounts lacked the required documentation, and Satcher also failed to provide Chrysler Capital with the results of even this review.  [Exh. 11 (Audit Summary); Exh. 6 (Thigpen Tr.) at 104:8-107:16; Exh. 4 (D. Satcher 12/6/2016 Tr.) at 29:20-22; Exh. 1 (Kasak Decl.) ¶ 24.]

### ii.    Satcher breached paragraph 4(c) by failing to inform Chrysler Capital of the FBI's investigation.

On November 5, 2015, Satcher received a grand jury subpoena and the FBI entered Satcher's dealership and requested that Satcher provide deal jackets for fifty-five deals originated by Satcher—the same deals that Chrysler Capital requested Satcher audit.  [Exh. 4 (D. Satcher 12/6/16 Tr.) at 8:14-18, 9:4-10:18.]   Satcher retained counsel to assist them with the FBI's investigation.  [Exh. 12 (M. Satcher Tr.) at 39:17-40:1.]  Based on this, it is clear that Satcher was concerned about an "actual, suspected or attempted" violation of the law.  Satcher, however, never informed Chrysler Capital that the FBI entered Satcher's dealership and had collected information relating to these loans.  [Exh. 4 (D. Satcher 12/6/16 Tr.) at 10:19-21.]  This violates Satcher's obligations under paragraph 4(c), and Chrysler Capital is entitled to summary judgment on its breach of contract claim.

Satcher's admitted refusal to cooperate with Chrysler Capital's efforts to investigate the fraudulent applications being submitted by Satcher constitutes multiple breaches of the Agreements.  Satcher has also refused to repurchase those agreements from Chrysler Capital as required by the Agreements, and instead sued Chrysler Capital in this litigation.  Therefore, Chrysler Capital is entitled to summary judgment on its breach of contract claim.

### C.    Chrysler Capital was Damaged by Satcher's Breach

As a result of Satcher's breach of the Agreements, Chrysler Capital incurred over $1,000,000 in damages, which includes damages sustained by Satcher's failure to repurchase the

accounts as required by the Agreements and as discussed in more detail below.  [*See* Exh. 1 (Kasak Decl.) ¶¶ 25-26.]

### III.    Chrysler Capital is Entitled to Summary Judgment on Satcher's Declaratory Judgment Claim Because Satcher's Declaratory Judgment Claim is Procedurally Inappropriate and Because Satcher Breached the Agreements and Is Obligated to Repurchase the Accounts.

In addition to its breach of contract claim, Satcher also brings a declaratory judgment claim against Chrysler Capital.   The Declaratory Judgment Act pronounces "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  A declaration issued under the Act "shall have the force and effect of a final judgment."  *Id.*  Here, Satcher requests declaratory judgment on the following items:  (1) that Satcher is not obligated to repurchase the following loans: Stephanie S. (App. ID 51574715),) Johnny C. (App. ID 70512822), Linda B. (App. ID 6653897), Patsy R. (App. ID 56241645), those set forth in Exhibit 3 to Satcher's Amended Complaint; (2) that the governing contract is Exhibit B to the Amended Complaint (the "Road Loans Agreement") and that Chrysler Capital breached the Road Loans Agreement; (3) that Chrysler Capital cannot suspend Satcher from its financing program and that Chrysler Capital acted in bad faith by suspending Satcher from its financing program without sufficient notice and without sufficient explanation; and (4) that the DFS Agreement was terminated.  [Am. Compl. ¶ 36.]  Each of these contentions lack merit.

### A.    Satcher's Declaratory Judgment Claim is Procedurally Inappropriate Because Satcher Seeks to Adjudicate Its Past Conduct and Liability to Chrysler Capital.

"[D]eclaratory judgments are designed to declare rights so that parties can conform their conduct to avoid future litigation, and are untimely if the questionable conduct has already occurred or damages have already accrued." *Koon v. McBee*, No. 2:14-CV-2663-RBH, 2015 WL

2105904, at *3 (D.S.C. May 6, 2015), *aff'd*, 613 F. App'x 269 (4th Cir. 2015) (citations and quotations omitted) (noting declaratory judgment claim was improper where it sought a remedy for alleged wrongs that already occurred); *see also Rowley v. City of North Myrtle Beach,* Nos. 4:06–1873–TLW–TER, 4:07–1636–TLW–TER, 2009 WL 750406 (D.S.C. March 16, 2009) (holding that declaratory judgment is inappropriate solely to adjudicate past conduct or as a means to proclaim that one party is liable to another) (citing *Corliss v. O'Brien,* 200 F. App'x 80, 84 (3d Cir.2006)); *Trevillyan v. APX Alarm Sec. Sys., Inc.*, No. CA 2:10-1387-MBS, 2011 WL 11611, at *9 (D.S.C. Jan. 3, 2011) (granting motion to dismiss where party improperly used declaratory judgment to adjudicate past conduct).

Here, all of Satcher's requests for declaratory judgment concern the liability of the parties to one another, including either (1) the substance of Satcher's breach of contract claim, or (2) the substance of Chrysler Capital's breach of contract claim.  For example, Chrysler Capital contends that Satcher has already breached the Agreements by failing to repurchase the loans.  Satcher contends that Chrysler Capital has already breached the Agreements and the covenant of good faith and fair dealing by suspending Satcher without notice and without explanation.  At the heart of both of those claims is which agreement is applicable.   Indeed, Satcher specifically seeks declaratory judgment that Chrysler Capital breached an agreement.   Thus, because Satcher's requests concern past conduct and the liability between the parties—after damages have occurred —declaratory judgment is an inappropriate procedural mechanism.  Chrysler Capital is entitled to summary judgment on this claim.

### B.    Satcher is Obligated to Repurchase the Identified Loans Because it Breached Material Obligations under the Agreements.

Under paragraph 7(a) of the Chrysler Capital Agreement, Chrysler Capital has the

right to require [Satcher] to purchase from Chrysler Capital a Contract that [Satcher] has originated (the 'Chargeback'), and [Satcher] shall pay to Chrysler Capital the

Chargeback Amount with respect to the Contract where: (i) [Satcher] fails to comply with any material term or condition of this Agreement; [or] (ii) any representation or warranty made by [Satcher] is false or inaccurate[.]

Similarly, under paragraph 9(A) of the DFS Agreement:

[i]f a [Satcher] representation, warranty or covenant made herein . . . is breached or is untrue, or if [Satcher] fails to perform any of its obligations to [Chrysler Capital] . . . then [Satcher] shall pay [Chrysler Capital] immediately upon receipt of [Chrysler Capital's] demand, one or more of the following amounts at the sole election of [Chrysler Capital]: (1) the unpaid balance . . . of the breached Contract purchased, less any unearned finance charges and any discounts [or] . . . (2) all losses and expenses incurred by [Chrysler Capital] as a result of such breach, or untruth, or failure to perform, including attorney's fees[.]

Here, and as discussed in more detail in Section II, Satcher breached the Chrysler Capital Agreement by failing to cooperate with Chrysler Capital's request for an audit. Additionally, Satcher breached both Agreements by submitting applications to Santander that it knew contained false information and/or information that had not been verified. Further, Satcher breached the Agreements by failing to notify Chrysler Capital after it received the federal grand jury subpoena and had the FBI request deal jackets for use in a federal investigation. Because Satcher did so, Satcher is obligated to repurchase the identified accounts. [Exh. 3 (Chrysler Capital Agreement) ¶ 7(a); Exh. 2 (DFS Agreement) ¶ 9(A).] Therefore, Satcher is obligated to repurchase the identified accounts, and Chrysler Capital is entitled to summary judgment on this claim.

### C. Satcher Admits that the Applicable Contract is the Chrysler Capital Agreement, not the Road Loans Agreement.

Satcher seeks a declaratory judgment the Road Loans Agreement is the applicable agreement and that Chrysler Capital breached that agreement. Satcher admits that the Chrysler Capital Agreement—not the Road Loans Agreement—is applicable to the accounts at issue in this litigation. [Exh. 4 (D. Satcher 12/6/2016 Tr. at 5:20-6:7, 7:13-18 (agreeing that the Chrysler Capital Agreement, which is also attached to the Amended Complaint as Exhibit 1, is the applicable contract); Exh. 13 (Prince Tr.) at 169:9-171:2 (stating that Prince has never financed a

deal using the Road Loans Program).]  Therefore, Chrysler Capital is entitled to summary judgment on this claim.

### D. Chrysler Capital Can Suspend Satcher from its Financing Program Without Notice Because It Identified a Pattern of Fraudulent or Suspicious Activity and Because Satcher Breached the Agreements.

Satcher seeks a declaratory judgment that Chrysler Capital could not suspend Satcher from its financing program and that Chrysler Capital acted in bad faith by suspending Satcher without notice and without explanation.  However, and as discussed in more detail in Section I.A., the Agreements do not require Chrysler Capital to fund Satcher's loans.  Furthermore, Chrysler Capital Agreement could immediately suspend Satcher from the program without notice if Chrysler Capital determined there was a pattern of fraudulent or suspicious activity or could terminate the relationship.  [Exh. 3 (Chrysler Capital Agreement) ¶¶ 15(c)-(d); Exh. 2 (DFS Agreement) ¶ 9(D).] Chrysler Capital identified such a pattern through its internal investigation into the fraudulent accounts that originated at Satcher's dealership and asked Satcher to assist it with further investigations.  Further, Chrysler Capital explained the reasoning for Satcher's suspension during the September 25, 2015 call, and Satcher has admitted that taking time to investigate the suspected fraud was a prudent business decision.  [Exh. 4 (D. Satcher 12/6/2016 Tr.) at 14:9-14, 24:20-25:11.]  For these reasons, Chrysler Capital was not obligated to provide funding to Satcher and is entitled to summary judgment on this claim.

### E. The DFS Agreement was Never Terminated.

In its fourth request, Satcher seeks a declaratory judgment that the DFS Agreement was terminated.  It was not.  Rather, the DFS Agreement is a valid agreement that remains in effect and that governs four of the accounts at issue in this case.  [Exh. 1 (Kasak Decl.) ¶ 8].  Therefore, Chrysler Capital is entitled to summary judgment on this claim.

## CONCLUSION

WHEREFORE, Chrysler Capital respectfully requests that this Court grant its Motion and enter summary judgment in favor of Chrysler Capital on all claims alleged in the Amended Complaint and Amended Counterclaims.

This the 22nd day of December, 2016.

Respectfully submitted,

*/s/ Robert A. Muckenfuss*
Robert A. Muckenfuss
Federal Bar No. 7333
Trent M. Grissom
Federal Bar No. 10671
MCGUIREWOODS LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
Telephone: (704) 343-2162
Fax: (704) 444-8819
Email: rmuckenfuss@mcguirewoods.com
Email: tgrissom@mcguirewoods.com

John Huske Anderson , Jr
(*admitted pro hac vice*)
MCGUIREWOODS LLP
300 North Third Street, Suite 320
Wilmington, NC 28401
Telephone: 910-254-3800
Fax: 910-254-3900
Email: jhanderson@mcguirewoods.com
*Attorneys for SANTANDER CONSUMER USA INC., d/b/a CHRYSLER CAPITAL*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd day of December, 2016, served the foregoing with the Clerk of the Court using the CM/ECF System, which sent notification of such filing to all counsel of record:

**James Mixon Griffin**
**Margaret N. Fox**
Griffin and Davis
1116 Blanding Street
First Floor
Columbia, SC 29201
803-744-0800
Fax: 803-744-0805
Email: jgriffin@griffindavislaw.com
mfox@griffindavislaw.com
*Attorney for Plaintiff*

**Richard A Harpootlian**
Richard A. Harpootlian Law Office
1410 Laurel Street
Columbia, SC 29201
803-252-4848
Email: rah@harpootlianlaw.com
*Attorney for Plaintiff*

     /s/ *Robert A. Muckenfuss*
Robert A. Muckenfuss
*Attorneys for SANTANDER CONSUMER USA INC.,*
*d/b/a CHRYSLER CAPITAL*

25